ams
# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| ICE CORPORATION, )<br>)<br>           Plaintiff, )<br>)<br>vs. )<br>)<br>HAMILTON SUNDSTRAND )<br>CORPORATION and )<br>RATIER-FIGEAC, S.A.S, )<br>)<br>          Defendants. )<br>) | Case No. 05-4135-JAR |

## MEMORANDUM AND ORDER

This matter is before the Court on review of the punitive damages awards made by the jury. The parties have filed briefs on the propriety of these awards and the Court heard oral argument on April 17, 2009. As described more fully below, the Court finds that the following punitive, or exemplary damages are appropriate: (1) against defendant Ratier-Figeac, S.A.S. in the amount of $9,590,600; and (2) against defendant Hamilton Sundstrand Corporation, in the amount of $2,397,650.

**I.     Background**

This case proceeded to trial on various claims asserted by plaintiff under Kansas law, including claims for fraud and for misappropriation of trade secrets pursuant to the Kansas Uniform Trade Secrets Act ("KUTSA"). Plaintiff sought punitive damages on these claims. Before trial, the parties jointly submitted a jury instruction contemplating that the jury would decide entitlement to punitive damages but not the amount, in accordance with the general

procedure under Kansas law.[1]  Just prior to the jury instruction conference on the day before the case was submitted to the jury, plaintiff asserted for the first time that it had a constitutional right to have the jury determine the amount of punitive damages.[2]  Defendants objected.  The Court decided to submit the question to the jury but stated that it would be an advisory award.  The jury was instructed on certain factors set forth in K.S.A. § 60-3702(b) to guide its determination of the amount of punitive damages.[3]

On March 9, 2009, the jury returned its verdicts.  Against Hamilton, the jury found liability on the claim for misappropriation of trade secrets.  It found that the misappropriation was willful and/or malicious and that punitive damages should be awarded in the amount of $2,500,000.  Against Ratier, the jury did not find liability on the fraud claim but did find liability on the claim for misappropriation of trade secrets.  It found that the misappropriation was willful and/or malicious, and that punitive damages should be awarded in the amount of $10,000,000.  The jury was also asked to specify which of the three alleged trade secrets had been misappropriated.  Against Hamilton, the jury found that two of the three trade secrets were misappropriated—the BIT system and the faults and table of fault codes.  Against Ratier, the jury found that all three trade secrets had been misappropriated.

At a March 17, 2009 telephonic hearing, the Court agreed that briefing and a hearing would be in order on the jury's advisory punitive damages awards, although no new evidence should be presented on this issue.  The Court agreed to delay entry of judgment against both

---

[1](*See, e.g.*, Docs. 624, 625.)  K.S.A. § 60-3702(a).

[2](Doc. 747.)

[3](Doc. 800, Instruction 36.)

defendants until the parties were heard on this issue. Therefore, defendants' motion to delay judgment pending a "separate proceeding" on punitive damages was granted.[4]

## II.     Kansas Statutes and the Seventh Amendment

Plaintiff's trade secrets claim arises under Kansas law. Specifically, the KUTSA provides that "[i]f willful and malicious misappropriation exists, <u>the court</u> may award exemplary damages in an amount not exceeding twice any award made under subsection (a)."[5] Subsection (a) governs compensatory damages. Therefore, if Kansas law controls the issue of exemplary damages, it is within the Court's discretion to award exemplary damages not to exceed twice the amount of actual damages awarded on the KUTSA claim. "Where a jury has already found willful infringement, however, that discretion is limited. In such circumstances, a court may refuse to enhance damages only if it can do so without second guessing the jury or contradicting its findings."[6] This procedure is modeled after the procedure used in federal patent law.[7]

Plaintiff argues that, despite this statutory language, the amount of punitive damages should be determined by the jury.[8] Under the *Erie* doctrine, a court sitting in diversity applies the state's substantive law, but federal procedural rules control.[9] *Erie* may not be invoked to

---

[4](Doc. 771.)

[5]K.S.A. § 60-3322(b) (emphasis added).

[6]*Biocore v. Khosrowshahi*, No. 98-2031, 2004 WL 303194, at *4 (D. Kan. Feb. 2, 2004).

[7]*See* UTSA § 3, cmt.

[8]K.S.A. § 60-3322(a) (providing that the jury decides whether punitive damages should be awarded and the court decides the amount).

[9]*Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1539 (10th Cir. 1996).

void a Federal Rule, so if there is a direct collision, the state rule must yield to the federal rule.[10] Plaintiff submits that under the Seventh Amendment, federal procedure requires that a jury determine the amount of punitive damages.  This issue has been considered by other judges in this district with regard to K.S.A. § 60-3702(a), the general punitive and exemplary damages statute, which bifurcates that punitive damages determination: the jury determines entitlement to punitive damages and the court determines the amount of punitive damages.  Three judges in this district have found K.S.A. § 60-3702(a) substantive, and therefore applied the two-step procedure set forth therein, with no Seventh Amendment analysis.[11]  Other judges in this district have held that the bifurcated procedure set forth in K.S.A. § 60-3702(a) is procedural, and therefore, not binding on a federal court sitting in diversity.[12]  There is no Tenth Circuit authority that resolves the split of opinion in this district.[13]

Judge Brown and Judge Crow have both held that under the Seventh Amendment and Fed. R. Civ. P. 38, a litigant is entitled to have a jury decide the amount of punitive damages despite the procedure set forth in K.S.A. § 60-3702(a) .[14]  Of course, in this case the provision

---

[10]*Id.* (stating the question as "whether, when fairly construed, the scope of the Federal Rule is sufficiently broad to cause a direct collision with the state law or, implicitly, to control the issue before the court, thereby leaving no room for the operation of the state law.").

[11]*H. Wayne Palmer & Assocs. v. Heldor Indus.*, 839 F. Supp. 770, 777 (D. Kan. 1993) (Lungstrum, J.); *Ruiz v. Quiktrip Corp.*, 826 F. Supp. 1284, 1285 n.1 (D. Kan. 1993) (O'Connor, J.); *Whittenburg v. L.J. Holding Co.*, 830 F. Supp. 557, 565 n.9 (D. Kan. 1993) (Saffels, J.).

[12]*Jones v. UPS, Inc.*, No. 06-2143-JPO, 2008 WL 3884313, at *2 (D. Kan. Aug. 18, 2008) (O'Hara, J.); *Scheufler v. Gen. Host Corp.*, 895 F. Supp. 1411, 1414–15 (D. Kan. 1995) (Theis, J.).

[13]The Tenth Circuit has affirmed a punitive damages awards determined by the court without considering the Seventh Amendment.  *See Scheufler v. Gen. Host Corp.*, 126 F.3d 1261, 1272 (10th Cir. 1997).

[14]*Vance v. Midwest Coast Transp., Inc.*, 314 F. Supp. 2d 1089, 1093 (D. Kan. 2004); *Oleson v. Kmart Corp.*, 185 F.R.D. 631, 637 (D. Kan. 1999); *Busby, Inc. v. Smoky Valley Bean, Inc.*, No. 90-4071-SAC, 1993 WL 105142 (D. Kan. Mar. 16, 1993).

that allocates the function of finding exemplary damages to a judge is a different statute, § 60-3322(b). The Seventh Amendment governs both the allocation of trial functions between judge and jury and the allocation of authority to review verdicts.[15] It does not govern proceedings in state court.[16] The Supreme Court has acknowledged that "[t]he Seventh Amendment is silent on the question whether a jury must determine the remedy in a trial in which it must determine liability."[17] And that "[n]othing in the Amendment's language suggests that the right to a jury trial extends to the remedy phase of a civil trial. Instead, the language 'defines the kind of cases for which jury trial is preserved, namely "suits at common law."'"[18] For purposes of the reexamination clause, the Supreme Court has determined that "the level of punitive damages is not really a 'fact' 'tried' by the jury."[19]

As already discussed, the damages provision of the UTSA, adopted by Kansas, is modeled after patent law. Under 35 U.S.C. § 284, Congress provided:

> When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed. Increased damages under this paragraph shall not apply to provision rights under section 154(d) of this title.

The Fifth Circuit has held that this provision, allowing the judge to award exemplary damages in

---

[15] *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 432 (1996). The Seventh Amendment states: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. CONST. amend. VII.

[16] *See, e.g.*, *Gasperini*, 518 U.S. at 432.

[17] *Tull v. United States*, 481 U.S. 412, 426 (1987).

[18] *Id.* n.9 (quoting *Colgrove v. Battin*, 413 U.S. 149, 152 (1973)). The parties do not dispute that the cause of action for misappropriation of trade secrets is subject to the Seventh Amendment right to trial by jury. The only question at issue before the Court is whether the <u>amount</u> of punitive damages is subject to the Seventh Amendment.

[19] *Cooper Indus. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 437 (2001).

5

a patent case where the jury has awarded actual damages, does not deny a plaintiff a constitutional right to a jury trial.[20]  It is clear that the issue of whether the trade secret misappropriation is "willful or malicious" is triable by a jury in federal court.[21]  However, there is no authority that the question of <u>amount</u> of exemplary damages under patent law or the UTSA must be decided by a jury in federal court.  Federal cases applying this provision of the UTSA overwhelmingly involve a court determination of exemplary damages as provided in section 3.[22]  Given this authority, the Court finds that there is no federal rule or constitutional provision that conflicts with the KUTSA provision that the court must determine the <u>amount</u> of punitive damages once a jury determines the factual issue of willful and malicious misappropriation.

The Court also finds that under the "typical, relatively unguided *Erie* choice" of applying the outcome determinative test in light of the twin aims of *Erie*, the statute should be applied in federal court.  The KUTSA, which requires the Court to award, in its discretion, exemplary damages where willful or malicious misappropriation is found, does not encroach on the federal

---

[20]*Swofford v. B&W, Inc.*, 336 F.2d 406, 412–13 (5th Cir. 1964).  The Supreme Court has similarly stated that "Congress' assignment of the determination of the amount of civil penalties to trial judges therefore does not infringe on the constitutional right to a jury trial.  Since Congress itself may fix the civil penalties, it may delegate that determination to trial judges."  *Tull*, 481 U.S. at 426–27.

[21]*Pichler v. UNITE*, 542 F.3d 380, 386–87 (3d Cir. 2008); *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 730 (7th Cir. 2003); *Norfin, Inc. v. IBM Corp.*, 625 F.2d 357, 366 (10th Cir. 1980); *Pearl Invs., LLC v. Standard I/O, Inc.*, 297 F. Supp. 2d 335, 338 (D. Md. 2004); *cf. Kampa v. White Consol. Indus.*, 115 F.3d 585, 587 (8th Cir. 1997) (determining that a jury trial right exists for a cause of action under state law even though the state statute precludes it).

[22]*See, e.g.*, *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1078 (N.D. Cal. 2005); *Biocore v. Khosrowshahi*, No. 98-2031, 2004 WL 303194, at *4 (D. Kan. Feb. 2, 2004).  *But cf. Mid-Michigan Computer Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 512 (6th Cir. 2005) (dismissing defendant's challenge to punitive damages award as excessive based on statutory damages cap as a result of affirming district court's decision not to remit compensatory damages award).

courts' distribution of trial functions, as already described.[23]  Moreover, the "discouragement of forum-shopping and avoidance of inequitable administration of the laws,"[24] counsel in favor of the Court determining exemplary damages in this matter.  Unlike the K.S.A. § 60-3702(a), § 60-3322(b) tracks a uniform act as well as federal patent law.  As such, a consistent application of this provision is in the best interest of avoiding inequitable administration of the laws.  The goal of uniform acts is to promote consistency in state laws on these claims.  The Court finds that the exemplary damages provision in the KUTSA is a substantive rule under the applicable authority and applies it in this case.

The parties have also briefed for the first time the separate but related issue of whether the damages cap in the KUTSA or the general punitive damages cap under K.S.A. § 60-3702(e)–(f) controls in this matter.[25]  Plaintiff urges application of the KUTSA, while defendants argue that the general cap should apply.  Under Kansas law, "[a] specific statute or rule controls over a more general one."[26]  Furthermore, the cap under the KUTSA is specific to claims for misappropriation of trade secrets and controls over the general punitive damages cap found in K.S.A. § 60-3702(e)–(f).[27]  Therefore, the exemplary damages awards may not exceed twice the

---

[23]*See Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525, 537 (1958) (declining to apply a state rule that altered the federal courts' distribution of trial functions between judge and jury).

[24]*See Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1540 (10th Cir. 1996).

[25]The Court notes strong authority for the proposition that post-verdict application of a statutory damages cap does not violate Due Process. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 429 n.9 (1996); *Estate of Sisk v. Manzanares*, 270 F. Supp. 2d 1265, 1278–79 (D. Kan. 2003) (collecting cases).

[26]*See, e.g.*, In re *K.M.H.*, 169 P.3d 1025, 1043 (Kan. 2008); *Fisher v. Kansas*, –P.3d–, 2009 WL 1025306 (Kan. Ct. App. 2009).

[27]*See* K.S.A. § 60-3326(a) ("this act displaces conflicting tort, restitutionary and other law of this state providing civil remedies for misappropriation of a trade secret); *Yeti By Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1111–12 (9th Cir. 2001) (finding district court incorrectly applied Montana law by using punitive damages definition under the general punitive damages statute instead of the definition of exemplary damages under

7

amount of compensatory damages assessed against each defendant as provided in K.S.A. § 60-3322(b).

## III.     Findings of Fact and Conclusions of Law

"In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. . . . A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a)."[28] The findings of an advisory jury are merely advisory and "[w]hile the district court may exercise its discretion to accept or reject the advisory jury's verdict, the advisory jury's decision is not binding on the district court and the district court has the 'ultimate responsibility' for deciding the case's legal and factual issues."[29]

The parties appear to agree that in determining the amount of exemplary damages under the KUTSA, the Court should examine the factors set forth in the general punitive damages statute, K.S.A. § 60-3702(b):

> (1) The likelihood at the time of the alleged misconduct that serious harm would arise from the defendant's misconduct;
>
> (2) the degree of the defendant's awareness of that likelihood;
>
> (3) the profitability of the defendant's misconduct;
>
> (4) the duration of the misconduct and any intentional concealment of it;

---

Montana's version of the UTSA).

[28] Fed. R. Civ. P. 52(a), (c).

[29] *OCI Wyo., L.P. v. Pacificorp*, 479 F.3d 1199, 1206 (10th Cir. 2007). Given that the Court accepts ultimate responsibility for deciding the legal and factual issues with respect to punitive damages, it is unnecessary to consider defendants' arguments that the jury's awards were the product of bias and prejudice. Suffice it to say that the Court's punitive damage awards set forth herein are neither based on passion nor prejudice against a foreign defendant.

> (5) the attitude and conduct of the defendant upon discovery of the misconduct;
>
> (6) the financial condition of the defendant; and
>
> (7) the total deterrent effect of other damages and punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, compensatory, exemplary and punitive damage awards to persons in situations similar to those of the claimant and the severity of the criminal penalties to which the defendant has been or may be subjected.

The Court, in considering these factors, makes the following findings of fact and conclusions of law in reaching its decision on the appropriate amount of punitive damages to assess against each defendant. The Court recognizes that its discretion is limited to the amount of punitive damages only, as the jury has determined that the misappropriation was willful and/or malicious with regard to both defendants.[30]

Plaintiff alleged, and the jury believed, that defendants misappropriated certain trade secrets by disclosing them to ICE's competitor, Artus, during and after the 2005 Passport Review process. On August 7, 2005, Artus submitted a Commercial Proposal to Ratier on the project.[31] In it, Artus stated that it could not "base a sound proposal on such a preliminary technical requirements [sic], since many areas are not even addressed." Artus proposed to work together with Ratier over a three month period to produce its technical specification. The August 2005 proposal contained no technical specifications. No design documents by Artus from prior

---

[30] Multiple punitive damages awards may arise out of the same conduct. *Hayes Sight & Sound v. ONEOK, Inc.*, 136 P.3d 428, 452 (Kan. 2006).

[31] Trial Ex. 610.

9

to September 2005 were admitted into evidence.[32] Artus submitted numerous price proposals before ever performing design work. In September 2005, Artus provided a Design Analysis and Description ("DCS") with technical specifications.[33] But Arlie Stonestreet testified that it contained scant design information compared to what ICE had provided to defendants at a similar point in the process the year before. Artus proposed to use micro-interruptions on the power supply for the same 500ms duration as ICE had proposed.[34] There was evidence that ICE's three trade secrets were incorporated into Hamilton's updated specification, Version 01, that Artus received in January 2006, based on Stonestreet's testimony as well as the updated specification.[35] And Artus's subsequent Software Requirement Data, which contained much more detailed design information,[36] cross-references the Version 01 specification and contains the ICE communication method, CAN bus faults and fault codes, and BIT system. Stonestreet also testified at length about the similarities between the ICE and Artus specification documents and testified that ICE provided defendants with its SRS.

Additionally, prior to the Version 01 specification, Ratier engineers expressed frustration with the quality of design work provided to them by Artus.[37] A reasonable inference to be drawn from this evidence is that Ratier passed along ICE's trade secrets in order to save time during the

---

[32] Judge Sebelius had previously ruled that the Artus design documents were under the control of Ratier and, thus, subject to production during discovery. (Doc. 382.)

[33] Trial Ex. 724.

[34] *See also* Trial Ex. 1238.

[35] Trial Ex. 838.

[36] Trial Exs. 888, 73B.

[37] *See* Trial Ex. 790.

design process and ensure that it could use Artus as the supplier. Given this circumstantial evidence, it was certain that ICE would not receive the supplier contract; in fact, it is reasonable to infer from the evidence that the entire point of passing ICE's design information on to Artus was to avoid using ICE as the supplier for the deicing controller while continuing to utilize ICE's trade secrets. Beyond the harm to ICE of losing the supplier contract, the misappropriation placed ICE's trade secrets in the hands of one of its competitors.[38]

Defendants argue that no serious harm could have resulted from misappropriation of the trade secrets because they had no reason to believe that they were valuable or important. But the jury found that the communication method constituted a protectable trade secret. Necessarily, the jury found that all three trade secrets "derives[] economic value, actual or potential, from not being generally known to, or readily ascertainable by, other persons who can obtain economic value from its disclosures or use."[39] Likewise, the jury found that they disclosed those trade secrets, knowing, or having reason to know that they had been acquired under circumstances giving rise to a duty to maintain their secrecy. Indeed, numerous witnesses for the defendants testified that they understood that it would have been wrong to disclose ICE's proprietary information to Artus.[40]

There was also strong evidence of defendants' awareness of the likelihood of harm.

---

[38]Defendants argue that there was no evidence that the misappropriation caused ICE to lose the supplier contract because Curtiss-Wright, another supplier considered during the 2005 Passport Review, would have received the contract if Artus had not. But plaintiff's theory of the case was that, regardless of which company was chosen to replace ICE, the misappropriation was done in order to avoid choosing ICE as the supplier.

[39](Doc. 800, Instruction 29). The jury is presumed to have followed the instructions. *Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277, 1287 (10th Cir. 2000).

[40]To the extent defendants argue that there was insufficient evidence to support the jury's finding that this information constitutes trade secrets, it should be presented as a motion for judgment as a matter of law.

There were emails between the Hamilton engineers and Ken Mantha discussing their concern that Ratier would pass along ICE's proprietary information to Artus.[41] These emails show that Hamilton had at least constructive knowledge, at worst actual knowledge, that ICE's proprietary information would be passed along to Artus. Also in evidence is an email between Hamilton and Ratier representatives, in which Hamilton engineers warned Ratier not to share ICE's proprietary information with Artus. Bruno Seminel of Ratier admitted in an email to Hamilton engineers that ICE's information had been passed along to Artus: "I have very little memory of what ICE was doing, we kind of brain-stormed with ARTUS on what is the most appropriate solution . . . . What I can tell you is that we provided very (if not no) [little] information to ARTUS on ICE design."[42] Finally, Danielson admitted including the faults and fault code table into the Hamilton specification that was sent to Artus. This evidence establishes that defendants were aware of the likelihood of harm resulting from the misappropriation.

Plaintiff claimed lost profits as compensatory damages on the misappropriation claim based on a calculation of profits expected to be gained by Artus as the deicing controller supplier on the A400M contract. The jury found that plaintiff is entitled to the full amount of lost profits claimed against Ratier, $4,795,300. The Court found that plaintiff is likewise entitled to the full amount of lost profits claimed against Hamilton, $4,795,300. However, this factor on the issue of exemplary damages requires consideration of the profitability <u>to the defendant</u>. With regard to Hamilton, Mantha's deposition testimony established that Hamilton expected to realize profits from the sale of the aircraft's propeller system to Airbus in the form of a profit sharing

---

[41]*See, e.g.*, Trial Exs. 661, 665, 948.

[42]Trial Ex. 948.

agreement. Sebastian Mounier testified by deposition that the projected profit of the entire program for Ratier was in excess of twenty million euros. While it is true that these profits are in terms of the entire A400M program, certainly that profitability would be unattainable without the deicing controller. It is evidence of the strong incentive defendants had to deliver the propeller system to Airbus, which required a deicing controller that met Airbus specifications.

The Hamilton internal emails suggest that the misappropriation began as early as July and August 2005, during the Passport Review. Defendants sent Artus the updated specification in January 2006 containing ICE's trade secrets. Therefore, the misappropriation occurred for at least a five to six month period of time and there is evidence that the misappropriation continues, as Artus continues to rely upon the trade secrets in its design of the deicing controller.[43] Defendants urge that the patent application filed by plaintiff served to cut off the duration of any misappropriation. But the patent was not admitted into evidence at the behest of defendants.[44]

---

[43]Defendants cited *Post Office v. Portec* during oral argument for the proposition that the continuing use argument has been rejected by the Tenth Circuit. 913 F.2d 802 (10th Cir. 1990), *vacated by*, 935 F.2d 1105 (10th Cir. 1991). In that case, the court simply considered the fact that the district court had entered a broad injunction in reviewing the jury's punitive damages award. *Id.* at 811. The fact that the defendant would be prevented from manufacturing or selling the products at issue for a period of four years required the court to more carefully scrutinize the jury's large punitive damages award. *Id.*

[44]This issue comprised a good deal of time and briefing during the course of trial. (*See* Docs. 663, 722, 729.) The issue of admissibility of the patent and patent application was initially presented to the Court as a request to take judicial notice at the limine conference (Doc. 663). Defendants objected on the basis that admission of the patent would create a mini-trial about the validity of the patent, that it has no impact outside the jurisdiction of the United States, and that it would confuse and mislead the jury. The Court declined to take judicial notice of the patent and opted to wait to see how the evidence was presented to determine admissibility under Fed. R. Evid. 403. Plaintiff proffered the patent at various times during trial as evidence of its attempts to protect the information contained in the patent, ownership of the patent and of its independent economic value. Defendants strongly objected to the admission of the patent in evidence. Defendants argued that plaintiff did not refer to the patent in the Pretrial Order and that defendants are not claiming that they are the inventor or owner of the patent in this proceeding. Defendants assured the Court that they would not refer to the patent. Defendants argued that they strongly disputed the validity of the patent and that defendants' sales would be in Europe, where the patent has no effect. The Court ruled that if defendants offered evidence that Hamilton originated the communication method, which they had suggested during opening statements, the patent would probably be admissible. The Court stated that if it determined that the patent was admissible at least in part, it would be judicious about which parts would be admitted. Finally, the Court ruled on the issue when plaintiff sought to admit the evidence in rebuttal. The Court

agreement. Sebastian Mounier testified by deposition that the projected profit of the entire program for Ratier was in excess of twenty million euros. While it is true that these profits are in terms of the entire A400M program, certainly that profitability would be unattainable without the deicing controller. It is evidence of the strong incentive defendants had to deliver the propeller system to Airbus, which required a deicing controller that met Airbus specifications.

The Hamilton internal emails suggest that the misappropriation began as early as July and August 2005, during the Passport Review. Defendants sent Artus the updated specification in January 2006 containing ICE's trade secrets. Therefore, the misappropriation occurred for at least a five to six month period of time and there is evidence that the misappropriation continues, as Artus continues to rely upon the trade secrets in its design of the deicing controller.[43] Defendants urge that the patent application filed by plaintiff served to cut off the duration of any misappropriation. But the patent was not admitted into evidence at the behest of defendants.[44]

---

[43]Defendants cited *Post Office v. Portec* during oral argument for the proposition that the continuing use argument has been rejected by the Tenth Circuit. 913 F.2d 802 (10th Cir. 1990), *vacated by*, 935 F.2d 1105 (10th Cir. 1991). In that case, the court simply considered the fact that the district court had entered a broad injunction in reviewing the jury's punitive damages award. *Id.* at 811. The fact that the defendant would be prevented from manufacturing or selling the products at issue for a period of four years required the court to more carefully scrutinize the jury's large punitive damages award. *Id.*

[44]This issue comprised a good deal of time and briefing during the course of trial. (*See* Docs. 663, 722, 729.) The issue of admissibility of the patent and patent application was initially presented to the Court as a request to take judicial notice at the limine conference (Doc. 663). Defendants objected on the basis that admission of the patent would create a mini-trial about the validity of the patent, that it has no impact outside the jurisdiction of the United States, and that it would confuse and mislead the jury. The Court declined to take judicial notice of the patent and opted to wait to see how the evidence was presented to determine admissibility under Fed. R. Evid. 403. Plaintiff proffered the patent at various times during trial as evidence of its attempts to protect the information contained in the patent, ownership of the patent and of its independent economic value. Defendants strongly objected to the admission of the patent in evidence. Defendants argued that plaintiff did not refer to the patent in the Pretrial Order and that defendants are not claiming that they are the inventor or owner of the patent in this proceeding. Defendants assured the Court that they would not refer to the patent. Defendants argued that they strongly disputed the validity of the patent and that defendants' sales would be in Europe, where the patent has no effect. The Court ruled that if defendants offered evidence that Hamilton originated the communication method, which they had suggested during opening statements, the patent would probably be admissible. The Court stated that if it determined that the patent was admissible at least in part, it would be judicious about which parts would be admitted. Finally, the Court ruled on the issue when plaintiff sought to admit the evidence in rebuttal. The Court

The Court will not consider evidence not admitted at trial, particularly when it sustained repeated objections by the defendants to its admission.

The intentional concealment of misappropriation is evidenced by the fact that defendants incorporated the trade secrets into their updated specification that would be sent to Artus, renaming ICE's trade secrets as their own. Dave Danielson admitted during his testimony that Hamilton incorporated ICE's BIT system and CAN bus fault code table into the updated specification. Also, defendants deny providing information to Artus at all, while at the same time suggesting that any design document by ICE that lacked an ICE proprietary legend was not protectable, despite the fact that Ratier employees admitted that they would not want their own design documents held to that standard. Moreover, the similarity between ICE's Software Requirements Specification and Artus's Software Requirement Data evidence Ratier's intent to conceal the misappropriation of all three trade secrets.[45] However, the jury found no liability against Hamilton for the misappropriation of ICE's communication method.[46] The Court takes this important fact into consideration in fashioning a lesser punitive damages award against Hamilton.

There is no evidence of the financial condition of defendant.

Plaintiff has been awarded the full amount of lost profits compensatory damages against both defendants, $4,795,300. Defendants suggest that the Court should also consider the

---

sustained defendants objections on the ground that the minimal relevance to establishing that the design was novel was outweighed by the prejudice to the defendants in not having an expert available to testify about the validity of the patent and about prior art.

[45] Trial Exs. 360, 73B.

[46] The Court notes that the jury necessarily found that the communication method was a trade secret, as it found that Ratier was liable for misappropriation for all three alleged trade secrets. (Doc. 757, Question 9a.)

attorneys' fees and expenses defendants have paid, nearly $3 million, which were expended in part on defending against "improper and meritless" positions taken by plaintiff during the course of litigation. While the Court considers that defendants have spent much time and money litigating this case, it declines to recognize the conclusory allegation that plaintiff has taken improper and meritless positions in this lawsuit. Given the history and contentiousness in this case, the Court finds that both sides have contributed to the protracted nature of this litigation.

Considering all of the above factors and evidence that pertains to them, the Court finds that an exemplary damages award of $9,590,600 shall be imposed against Ratier. After conducting a de novo review of the evidence that pertains to the relevant factors, the Court agrees with the jury's advisory verdict that a large exemplary damages award is in order. The Court exercises its discretion to award exemplary damages in an amount two times the compensatory damages award. The Court also agrees with the advisory jury's verdict that a lesser amount of exemplary damages is appropriate against Hamilton and the Court finds that half the amount of compensatory damages should be awarded, $2,397,650. This is especially appropriate in light of the fact that the jury found willful misappropriation on the part of Hamilton with respect to only two out of the three trade secrets. It is also appropriate in light of the fact that Hamilton made some effort to prevent Ratier from utilizing ICE's proprietary information.

### IV.    Constitutional Review of the Punitive Damage Awards

Because the Court's punitive damage awards are so closely aligned with the awards made by the advisory jury, the Court proceeds to address defendants' arguments that the advisory jury's verdicts were excessive in violation of Due Process. In reviewing a punitive damage

award, the Court is to consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."[47]

The most important guidepost in determining the reasonableness of a punitive damage award is the reprehensibility of the defendant's misconduct. Under this guidepost, relevant factors include whether the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.[48] Defendants urge that all of these factors weigh against a substantial punitive damages award. It is true that the harm caused in this case was purely economic and did not involve an indifference to the health or safety of others. But the Supreme Court has explained:

> To be sure, infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty. But this observation does not convert all acts that cause economic harm into torts that are sufficiently reprehensible to justify a significant sanction in addition to compensatory damages.[49]

The jury found by clear and convincing evidence that the misappropriation of trade secrets was done willfully and/or maliciously. As discussed above, the evidence at trial showed that defendants were aware of the likelihood of harm to ICE that would result from misappropriating

---

[47]*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

[48]*Id.* at 419.

[49]*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 576 (1996).

its trade secrets. They were aware of the misappropriation or at least had a reckless disregard for the harm that would result from such misappropriation. The Court has also already discussed the evidence of intentional concealment. Such conduct is sufficiently reprehensible to justify a large punitive damages award as it involved intentional conduct.

The punitive damages award against Ratier is twice the amount of compensatory damages. The punitive damages award against Hamilton is half the amount of compensatory damages. The Supreme Court has recognized that "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . ."[50] The Court finds that these ratios are both reasonable and proportionate to the amount of harm suffered by plaintiff and the compensatory damages recovered by it. The compensatory damages award was substantial, in excess of $4.5 million in future lost profits, the full amount sought. Unlike in *Campbell*, the damages recovered here were purely economic; therefore, there is no risk that the compensatory damages contain a punitive element that overlaps with punitive damages, as there may be if damages were recovered for emotional distress.[51] Furthermore, the harm suffered was not isolated, but continues as defendants continue to use ICE's trade secrets in Artus's design of the deicing controller. Finally, the respective awards recognize the difference in reprehensibility between the two defendants, as Hamilton was found to have willfully and maliciously misappropriated only two of the three trade secrets, whereas Ratier was found to have willfully and maliciously misappropriated all three trade secrets.

---

[50]*Campbell*, 538 U.S. at 425.

[51]*Id.* at 426.

The third guidepost requires the Court to look at any disparity between the punitive damages awards and the civil penalties authorized or imposed in comparable cases. The Court also should look at criminal penalties that could be imposed.[52] The Economic Espionage Act contains a criminal penalty for economic espionage of no more than $500,000 for individuals and $10,000,000 for organizations.[53] For theft of trade secrets, the Act provides for a fine against individuals and a fine of no more than $5,000,000 against organizations. Moreover, the KUTSA clearly places defendants on notice that they are subject to exemplary damages awards up to two times the amount of compensatory damages awarded.

In conclusion, the Court has reviewed the requisite guideposts under Supreme Court jurisprudence and does not find that the Court's punitive damages awards are unconstitutionally excessive.

**IT IS THEREFORE ORDERED BY THE COURT** that punitive damages are imposed as follows against each defendant: (1) against defendant Ratier in the amount of $9,590,600; and (2) against defendant Hamilton, in the amount of $2,397,650.

**IT IS SO ORDERED**.

Dated:  May 7, 2009

                                               S/ Julie A. Robinson
                                               JULIE A. ROBINSON
                                               UNITED STATES DISTRICT JUDGE

---

[52]*Id.* at 428.

[53]18 U.S.C. § 1831.