ams

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ICE CORPORATION,         )
                               )
             Plaintiff,    )
                               )
        vs.              )     Case No. 05-4135-JAR
                               )
HAMILTON SUNDSTRAND   )
CORPORATION  and         )
RATIER-FIGEAC, S.A.S,     )
                               )
           Defendants.   )
_____)

## MEMORANDUM AND ORDER

This matter is before the Court for partial findings of fact and conclusions of law on the discrete issue of compensatory damages against defendant Hamilton Sundstrand Corp. ("Hamilton") for misappropriation of trade secrets under the Kansas Uniform Trade Secrets Act ("KUTSA").[1]  The parties have briefed the issue and the Court conducted a bench trial on April 17, 2009.  For the reasons set forth below, the Court awards plaintiff $4,795,300 in damages against defendant Hamilton on its KUTSA claim.

## I.      Background

This case was tried to a jury beginning on February 10, 2009.  Against defendant Ratier-Figeac S.A.S. ("Ratier"), the jury considered plaintiff's claims for breach of the duty of good faith and fair dealing, fraud, and misappropriation of trade secrets.  Against Hamilton, the jury

---

[1]*See* Fed. R. Civ. P. 52.

considered plaintiff's claims for unjust enrichment and misappropriation of trade secrets.[2]  The

jury returned its verdicts on March 9, 2009.  The jury found defendant Ratier liable for breach of

good faith and fair dealing and misappropriation of trade secrets, explicitly finding that Ratier

misappropriated all three trade secrets at issue.  It awarded plaintiff $153,708 on the breach of

contract claim and $4,795,300, the full amount of lost profits damages sought, on the

misappropriation of trade secrets claim.[3]  The jury found defendant Ratier not liable on

plaintiff's fraud claim.  The jury found Hamilton liable on both the unjust enrichment claim and

the misappropriation of trade secrets claim, awarding $35,825 on the unjust enrichment claim.[4]

In their jury instructions submissions, both parties requested one special verdict form for

both defendants and a special interrogatory asking the jury to quantify the compensatory

damages amount on the misappropriation of trade secrets claim.[5]  The Court proposed separate

verdict forms for each defendant.  The Court's proposed verdict form for Ratier contained a

special interrogatory for compensatory damages on the trade secrets claim but the Hamilton

verdict form inadvertently omitted this question.  In its objections to the Court's proposed

instructions, plaintiff asked that the question be added to the Hamilton verdict form.[6]  The Court

---

[2]Plaintiff voluntarily dismissed its claims against both defendants for negligent misrepresentation just prior to closing arguments.  The Court granted summary judgment on plaintiff's various claims for breach of contract and its common law claims for misappropriation of confidential proprietary information constituting unfair competition (Doc. 658).

[3]The jury additionally found Ratier acted willfully, wantonly, or maliciously on the misappropriation of trade secrets claim and that it was entitled to punitive damages in the amount of $10,000,000.  The Court reviews this award in a separate order.

[4]The jury additionally found Hamilton acted willfully, wantonly, or maliciously on the misappropriation of trade secrets claim and that it was entitled to punitive damages in the amount of $2,500,000.  The Court reviews this award along with the punitive damages award against Ratier.

[5](Docs. 625, 719.)

[6](Doc. 747.)

held an instruction conference on the morning of March 3, 2008, and the parties stated on the record any remaining objections they had to the Court's proposed jury instructions and the Court ruled.  With regard to the inadvertently omitted question on the Hamilton verdict form, the Court sustained plaintiff's objection; defendants did not oppose or simultaneously object to the omitted question.  The Court ruled on numerous other objections and proposed language changes to the instructions and the verdict forms.

After making the changes to the jury instructions and verdict forms discussed at the instruction conference, the parties were provided with revised verdict forms to review even prior to being provided with the final jury instructions.  Defendants reviewed the forms and asked that the punitive damages findings be requested separately on the Ratier form with respect to the fraud claim and the trade secrets claim.  The Court agreed and made the change; a revised Ratier verdict form was prepared and provided to the parties prior to the reading of instructions and closing arguments.  At no point before, during, or immediately after jury deliberations did any party object or point out that the Hamilton verdict form was still missing a question on compensatory damages for the trade secrets claim.  This was first raised by plaintiff in an email to the Court on March 11, 2009, two days after the verdict was published and the jury was released from its admonition not to discuss the case.

At a telephone conference to discuss this issue on March 17, 2009, the Court explained to the parties that pursuant to Fed. R. Civ. P. 49(a)(3), plaintiff demanded the question of compensatory damages on the KUTSA claim be submitted to the jury during the jury instruction conference, but it was inadvertently omitted from the final verdict form by the Court.  Because plaintiff preserved its objection to the omitted question, a new trial was in order on the limited

question of compensatory damages against defendant Hamilton.[7]  The Court asked plaintiff to

file its request for either a new jury trial or a trial to the Court on this limited issue and provided

defendants with a response deadline.  On March 18, 2009, plaintiff filed a waiver of jury trial on

the limited issue of actual damages resulting from misappropriation of trade secrets against

defendant Hamilton.[8]  Defendants did not file a response and the Court proceeded to set the

matter for a bench trial.[9]

   In its brief and at the bench trial, plaintiff asks the Court to award the full amount of lost

profits damages to Hamilton as the jury awarded to Ratier, $4,795,300.  Hamilton argues that

there is no evidence that any compensatory damages should be awarded.  Hamilton argues that:

(1) there is insufficient evidence to support that plaintiff lost profits because of the

misappropriation; (2) plaintiff failed to prove the amount of lost profits with reasonable certainty

because the factual assumptions used by plaintiff's damages expert were flawed; (3) plaintiff

failed to show a history of profitability; (4) there is no evidence upon which to base an award for

misappropriation of two out of the three claimed trade secrets; (5) damages should be limited, at

most, to the amount awarded by the jury to Hamilton on the unjust enrichment claim; and (6) the

Court should apply the offsetting benefits doctrine to reduce any award of damages by the

benefit to plaintiff of the U.S. 101 Contract.

---

[7]During the March 17, 2009 conference, counsel for defendants complained about the time it took plaintiff to bring this matter to the Court's attention and implied that it was not defendants' responsibility to draw the Court's attention to the error.  The Court presumes that if defendants' counsel recognized the error on the amended verdict form they would have brought the matter to the Court's attention at the time they discovered the error, given their ethical duty of candor to the tribunal.  *See* Kan. S. Ct. R. 226; D. Kan. R. 83.6.1.

[8](Doc. 766.)

[9]Given the failure to respond and the fact that defendants had not objected to omission at the instruction conference, the Court found that defendants also waived any right to jury trial on this issue.  (Docs. 768, 771.)

## II.      Findings of Fact and Conclusions of Law

The jury found both Ratier and Hamilton liable for misappropriation of trade secrets

under the KUTSA.  The damages provision of the KUTSA states:

> Except to the extent that a material and prejudicial change of
> position prior to acquiring knowledge or reason to know of
> misappropriation renders a monetary recovery inequitable, a
> complainant is entitled to recover damages for misappropriation.
> Damages can include both the actual loss caused by
> misappropriation and the unjust enrichment caused by
> misappropriation that is not taken into account in computing actual
> loss. In lieu of damages measured by any other methods, the
> damages caused by misappropriation may be measured by
> imposition of liability for a reasonable royalty for a
> misappropriator's unauthorized disclosure or use of a trade
> secret.[10]

The KUTSA does not define the proper measure of either "actual loss" or "unjust enrichment"

damages.   Plaintiff's net lost profits or defendants's net gain have been commonly used to

measure damages in misappropriation of trade secrets cases.[11]  Whether these damages are

classified as actual loss or unjust enrichment depends on the case.[12]  "The plaintiff is entitled to

---

[10]K.S.A. § 60-3322(a).

[11]*See Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1244 (8th Cir. 1994); *Telex Corp. v. IBM Corp.*, 510 F.2d 894, 931–32 (10th Cir. 1975); *Sperry Rand Corp. v. A-T-O, Inc.*, 447 F.2d 1387, 1394 n.4 (4th Cir. 1971); *see also* Intellisports LLC v. Fitzgerald, 87 P.3d 375 (table), 2004 WL 794458, at *4 (Kan. Ct. App. Apr. 9, 2004).

[12]*See, e.g.*, *Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1018 (10th Cir. 2008) (upholding jury's "unjust enrichment" award under Utah trade secrets statute of a percentage of the expert's calculation of defendant's net profits"); *Home Pride Foods, Inc. v. Johnson*, 634 N.W.2d 774, 711 (Neb. 2001); *Hauck Mfg. Co. v. Astec Indus., Inc.*, No. 1:03-CV-166, 2004 WL 5523286, at *3 (E.D. Tenn. Nov. 3, 2004) (notingplaintiff's claim for actual loss as includes lost profits; unjust enrichment includes research and development costs); *Total Care Physicians, P.A. v. O'Hara*, No. 99C-11-201JRJ, 2003 WL 21733023, at *4 (Del. Super. Ct. July 10, 2003) (stating actual loss is plaintiff's lost profits).  *But see Pro-Comp Mgmt., Inc. v. R.K. Enters., LLC*, 237 S.W.3d 20, 23–24 (Ark. 2006) (stating actual loss under the Arkansas statute is calculated as the plaintiff's lost profits or the defendant's gain, whichever affords greater recovery").  This case is difficult to classify because the damages are for the expected future profits by ICE, based on the expected future profits of a third-party competitor who is not the misappropriating party.  The price is based on the third-party's price, but the costs are based on plaintiff's actual costs.

the profit he would have made had his secret not been unlawfully used, but not less than the monetary gain which the defendant reaped from his improper acts."[13]

The amount of damages is a finding of fact.[14]  To show lost profits, plaintiff must show the future profits with reasonable certainty and that they were reasonably considered to have been within the contemplation of the parties.[15]  "Recovery for loss of profits . . . depends upon the facts and circumstances of each particular case."[16]  Absolute certainty in proving lost future profits is not required.[17]  Instead, the Court must be guided by "some rational standard."[18] "While estimates of lost future profits may necessarily contain some speculative elements, the factfinder must have before it such facts and circumstances to enable it to make an estimate of damage based upon judgment, not guesswork."[19]  In determining future lost profits, the Court should "require the claimant furnish the best available proof as to the amount of loss that the particular situation admits."[20]

Plaintiff's damages expert, Marc Vianello, testified at length about his lost profits calculation from ICE being denied the opportunity to supply the deicing controller unit to Ratier

---

[13]*Jet Spray Cooler, Inc. v. Crampton*, 385 N.E.2d 1349, 1356 (Mass. 1979).

[14]*Lippoldt v. Cole*, 468 F.3d 1204, 1220 (10th Cir. 2006).

[15]*Olathe Mfg., Inc. v. Browning Mfg.*, 915 P.2d 86, 103–04 (Kan. 1996); *Vickers v. Wichita St. Univ.*, 518 P.2d 512, 515 (Kan. 1974).

[16]*Vickers*, 518 P.2d at 515.

[17]*Id.*; *Olathe Mfg., Inc.*, 915 P.2d at 104.

[18]*Olathe Mfg., Inc.,* 915 P.2d at 104.

[19]*Malloy v. Monahan*, 73 F.3d 1012, 1016 (10th Cir. 1996).

[20]*Id.* (citation omitted).

on the A400M project..[21]  Vianello relied on the following information in calculating lost profits:
(1) a manufacturing duration of 2009 to 2021; (2) certain estimated annual deliveries of aircraft
to be produced in this duration; (3) a total production run of 392 aircraft, or 1568 controllers; (4)
ICE would have sold a spare controller for each aircraft manufactured; (5) production cost
amounts based on vendor purchase quotes obtained on November 21, 2006; and (6) a constant
sales price based on the contract entered into between Ratier and Artus, the replacement
manufacturer.  The Court has considered Vianello's testimony, and the exhibits submitted in
support of his testimony and gives great weight to his opinion on the appropriate amount of lost
profits in this matter.

### 1.        Assumptions on Duration, Delivery Schedule, and Production Quantity

In calculating ICE's lost profits, Vianello assumed Airbus would produce 392 aircraft,
requiring 1568 deicing units each consisting of one Static Control Unit ("SCU") and one
Distributor Unit ("DU").  Plaintiff submitted evidence to substantiate Vianello's reliance on the
projected sale of approximately 392 aircraft.  Ken Mantha of Hamilton confirmed this Airbus
projection.  Also, Alain Levy testified that Artus's proposal assumed sale of 350 aircraft, based
on Artus's analysis of the marketplace and not on information provided by Ratier.  This
independent evaluation of the market substantiates Vianello's estimates and shows that it is not
based on speculation.  Furthermore, the Court finds credible Vianello's testimony that the sale of
392 aircraft is conservative because it does not take into account potential sales to China, states
comprising the former U.S.S.R., or the United States, even though sales are expected in these

---

[21]The Court previously found Vianello qualified to render an opinion on lost profits damages in this matter
and found that his opinion was relevant and reliable under Fed. R. Evid. 702 and *Daubert*. (Doc. 708.)

markets.[22]

Vianello assumed a production duration 2009 to 2021.  This assumption is based on the most recent information provided to Vianello about the project's delivery schedule, which has been repeatedly delayed since the time ICE worked on the project.  Levy of Artus further testified that there is a delivery delay expected until 2010, which Vianello incorporated into his analysis.  Vianello assumed production of controllers for sixteen aircraft in the fourth quarter of 2009.  He testified that this assumption was based on the demand for the deicing controllers by Ratier prior to the delivery of the aircraft to Airbus.  Therefore, even if the aircraft production was delayed until 2010, Vianello assumed a there would be a need for the deicing controllers prior to any delivery of aircraft.  The Court finds this assumption is not based on speculation, but guided by a rational standard.

The Court recognizes the testimony of Ratier witnesses Malabre and Levy that the production schedule has been further delayed since Vianello's most recent damages calculation at the end of 2008.  Malabre testified the countries that have placed the 180 firm orders have the right not to accept the aircraft and that there was no production schedule currently in place.  Malabre did not testify that any of these orders would be cancelled or had been cancelled, however.  The testimony only supports the contention that the schedule Vianello used to calculate his damages may be delayed somewhat, not that the distribution of sales has no basis in

---

[22]Vianello testified that he projected sales of the A400M aircraft in addition to the 180 firm orders based on articles written about Airbus's expectation of future sales and Airbus press releases.  He stated that these materials showed a range from 435 to substantially more since those numbers do not include possible sales to the United States, Russia, or China.  He opined that Airbus reasonably expected to make sales of 392 total aircraft (200 over the production schedule) and proportionally shifted the production schedule to reflect this amount.  This information is included in Vianello's notebooks, which were made part of the record; however, they do not appear to have been offered, nor fully admitted into evidence at trial.

the evidence.  Based on the evidence Vianello had before him during his most recent calculation,

the Court declines to find that his estimates are based upon "mere guesswork."  In sum, the Court

finds Vianello's assumptions about the quantity and delivery schedule for the program were

supported by the evidence and did not constitute speculation.

### 2.    Cost Assumptions

The Court finds that the 2006 cost information utilized by Vianello is more appropriate

than the 2005 figures urged by defendants.  Plaintiff's lost profits damages are based on the

contention that, but for the misappropriation, ICE would have received the 2005 contract to

supply the deicing controller for the A400M project.  Therefore, the most recent cost information

would be the most reliable information on which to determine ICE's costs to be deducted from

the gross sales estimate.

There was no contract entered into between ICE and Ratier for the production of Option

3 mission critical deicing controllers for the A400M project.  The evidence did show that the

2005 cost figures were used by ICE in calculating its price proposals in 2005, but no contract

was ever entered into.  One of the difficulties in formulating a price proposal in 2005, as

Stonestreet testified, was that ICE did not yet have firm cost figures for the project, although it

anticipated cost reductions in the future.[23]  This was the reason ICE proposed a five-year fixed

rate that could be adjusted after ICE was able to obtain firm cost information.  Additionally,

Stonestreet testified at length about the changes and advances in testing, ordering, and

---

[23]*See* Trial Ex. 566 ("we can not pass along any savings based on presumptions or assumptions until we confirm these reductions will indeed materialize.  We will not have sight of the full potential of these savings until AFTER we have built some initial assemblies.  It is for this reason we offered to hold our current year pricing for the next few years with the caveat that at some future date we could re-negotiate a firm-fixed price which would be based on a precisely known cost model incorporating all know [sic] cost reduction measures . . . .").

9

production since June 2005 that have decreased ICE's costs.  The Court finds this testimony

credible and that the 2006 cost figures are a more accurate basis for Vianello's lost profits

analysis than the 2005 costs that are no longer valid.  This is the best available evidence upon

which to base the cost assumptions in this case.

### 3.    Price Assumption

Vianello's price assumption was based on the Artus contract with Ratier, which provided

a fixed price of $8701 per mission critical Option 3 controller through 2021.  Defendants argue

that because the lowest price that ICE ever quoted for this type of controller was $8930, the use

of the Artus contract price is erroneous.  But Connelly testified that during the Option 3 price

negotiations at the Paris Air Show, he offered $7800 as a concession, and offered a lower price

of $6771 for a fixed five year period subject to renegotiation, but that Ratier refused those

offers.[24]  Stonestreet testified that ICE's costs are lower now, compared to 2005, because it is

able to order from its suppliers in larger quantities.  Stonestreet testified, and contemporaneous

correspondence supports, that ICE was unable to quote any lower than those 2005 proposals

because of the prices being charged by their suppliers at the time.  But, Stonestreet also testified

that since June 2005, ICE has made changes in its approach to design and manufacturing that has

reduced its costs.  ICE automated certain processes that used to be manual, allowing shorter

production times and streamlining ordering parts and the organization of production and its

testing process.

Most importantly, there was no price finalized between ICE and Ratier for the supply of

Option 3 mission critical controllers.  To base a lost profits analysis on the existence of such a

---

[24]At this time, plaintiff was still negotiating the non-mission critical price.  Both Connelly and Stonestreet
testified that they had not been informed of the change to mission critical status at that time.

number when the negotiations fell through would be to engage in guesswork.  Instead, the Court

finds that the most rational standard by which to measure plaintiff's lost profits is the contract

price negotiated by its competitor, Artus, which it achieved in part by utilizing plaintiff's trade

secrets.  It is the best available proof available under the circumstances.[25]  At worst, this number

renders a conservative lost profits figure because it is lower than ICE's most recent Option 3

mission critical quote.

### 4.        Unitary Lost Profits Calculation

Vianello based his lost profits calculation on the sale of deicing controllers by ICE's

competitor for the A400M project.  He did not testify about the relative value of the three

claimed trade secrets, nor was there any other evidence presented at trial about the value of the

trade secrets.  Indeed, plaintiff has never claimed damages for the value of the trade secrets

themselves,[26] but instead for the value of plaintiff's lost sales of the product that includes the

three claimed trade secrets.

To be sure, the jury found that all three of the trade secrets are in fact trade secrets,

having found that Ratier misappropriated all three trade secrets resulting in damages of the full

amount of lost profits claimed.  The jury found that Hamilton misappropriated only two out of

the three claimed trade secrets, the BIT system and the CAN bus faults and fault code table.

This finding required the jury to conclude that these trade secrets had independent economic

value and such a finding was supported by Stonestreet's testimony about their value, which this

---

[25]*Olathe Mfg., Inc. v. Browning Mfg.*, 915 P.2d 86, 103–04 (Kan. 1996).

[26]The Fifth Circuit has stated that "normally the value of the secret to the plaintiff is an appropriate measure
of damages only when the defendant has in some way destroyed the value of the secret.  The most obvious way this
is done is through publication, so that no secret remains."  *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504
F.2d 518, 535 (5th Cir. 1974).

11

Court finds credible.   Plaintiff's lost profits are an appropriate measure of damages for the misappropriation in this case whether one, two, or all three of the trade secrets were misappropriated.  Because there is no evidentiary basis on which to reduce the claimed lost profits based on the misappropriation of only two trade secrets, the Court declines to reduce the lost profits on this ground.

Defendants cite *02 Micro International Ltd. v. Monolithic Power Systems, Inc.*[27] in support of their position that there can be no damages award where the jury finds less than all of the trade secrets to have been misappropriated.  In *02 Micro*, the jury awarded $12 million in "unjust enrichment damages" after finding that five of the eleven claimed trade secrets were misappropriated by the defendant and only one of the five resulted in unjust enrichment.  The plaintiff's damages expert calculated unjust enrichment damages of $16 million, assuming that all the trade secrets were misappropriated.  One of the plaintiff's corporate officers testified about the "value of 02 Micro's assets, including its trade secrets."  The Corporate officer was asked what value he would place on certain trade secrets, but he did not attempt to reasonably quantify the value of any one trade secret.  The Court found that the corporate officer did not provide a reasonable basis for the jury to apportion damages.  "It does not provide a reasonable basis for the jury to determine the amount that MPS was unjustly enriched based upon its misappropriation of Trade Secret 1."  The decision never explains the basis for the plaintiff's unjust enrichment damages claim; however, there is no indication that the damages claimed in that case involved lost profits.  They appear to be based on the value of the trade secrets themselves.

---

[27]399 F. Supp. 2d 1064 (N.D. Cal. 2005).

The facts of this case are distinguishable from *02 Micro*.  Here, plaintiff seeks lost profits in lieu of assigning a value to the trade secrets themselves.  Plaintiff's theory is that misappropriation of any one of the three trade secrets caused plaintiff's lost profits.  Therefore, the Court does not find that *02 Micro* applies to the facts of this case as there is no damages claim for the value of the trade secrets themselves.

###   5.     Profitability

ICE's most recent financial statement for fiscal year 2008 shows a net loss.[28]  One method of proving lost profits is by showing a history of past profitability, however, it is not the only method.[29]  The method of proof should be determined on a case by case basis.[30]  The evidence at trial showed that ICE has been in operation for many years.  Vianello testified that he examined Exhibit 281B in calculating a discount rate for his lost profits analysis and explained he used this document to support his contention that ICE would have had about eighty percent equity capital to complete the A400M project and would have borrowed about 20 percent.  Therefore, the lost profits analysis took into account this financial statement.  The Court is unable to find that plaintiff's loss in 2008, standing alone, negates its ability to recover lost profits in this matter.

###   6.     Remaining Issues

Defendants argue that there was insufficient evidence that plaintiff lost profits because of the misappropriation.  But the jury found causation as a necessary corollary to its finding of

---

[28](Trial Ex. 281B.)

[29]*Vickers v. Wichita St. Univ.*, 518 P.2d 512, 517 (Kan. 1974).

[30]*Id.*

liability, which this court will not disturb.  To the extent Hamilton contends that lost profits are an inappropriate measure of damages for misappropriation, the Court disagrees.  The law is clear that an appropriate measure of damages for misappropriation of trade secrets is plaintiff's lost profits.[31]   This measure of damage is not reliant on evidence that ICE would have received the supplier contract if Artus had not been selected after the 2005 Passport Review.   The misappropriation caused ICE to lose sales that would have been made by the replacement supplier—this is the appropriate measure of damages in a trade secrets misappropriation case.

Defendants argue that the Court should offset any lost profits with the amount gained by ICE for the U.S. 101 project.  The evidence at trial showed that ICE procured a government contract to supply the deicing controllers for the U.S. 101, the presidential helicopter.  The Court declined to instruct the jury on the offsetting benefits doctrine because it found there was no evidence that plaintiff could not have performed both the Ratier contract and the U.S. 101 contract at the same time.  The Court will not revisit this ruling.

Finally, defendants urge that if the Court awards lost profits it should award the amount of damages the jury found on the unjust enrichment claim against Hamilton—$35,825.  The Court is not bound by this factual finding.  First, the Court is required to make its own factual finding on the amount of damages with regard to the misappropriation of trade secrets claim.  Second, while the two claims are based on the same factual circumstances, they are not the same claims.  To be sure, defendants requested a special interrogatory on compensatory damages for each claim on each verdict form.  While the unjust enrichment claim is that Hamilton received and retained invaluable trade secret, confidential and proprietary information that has allowed

---

[31]*See supra* notes 11-13 and accompanying text.

14

Hamilton to move forward on the A400M project, the misappropriation claim goes one step further by alleging Hamilton disclosed this information to Artus without consent.

In conclusion, the Court finds that plaintiff is entitled to the entire amount of lost profits sought on the misappropriation of trade secrets claim.  The Court gives weight to Vianello's testimony and finds that it is a conservative estimate of lost profits.  To the extent that some of Vianello's assumptions are called into question by new scheduling information that he did not have before him at the time of his most recent report, it is counterbalanced by the conservative approach he took in calculating lost profits, as it does not include any sales to Russia, China, or the United States, and does not include inventory for a planned stocking repair center, or items shipped to ICE for repair.

**IT IS THEREFORE ORDERED BY THE COURT** that judgment should be entered in favor of plaintiff ICE Corporation in the amount of $4,795,300 against defendant Hamilton-Sundstrand Corporation.[32]

Dated:  May 7, 2009

        S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[32]The Court recognizes that any award against Hamilton will be joint and several with defendant Ratier as plaintiff may not recover twice for the same wrong.

15