**\*\*DRAFT\*\***
## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ICE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05-4135-JAR |
| | ) | |
| HAMILTON SUNDSTRAND | ) | |
| CORPORATION  and | ) | |
| RATIER-FIGEAC, S.A.S, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM AND ORDER</u>

This case is before the Court on remand from the Tenth Circuit Court of Appeals for determination of a punitive damages award under K.S.A. § 60-3702 against Defendant Ratier-Figeac, S.A.S.  Under the mandate, the Court must either apply the $5 million cap to the punitive damages award in this case and reduce the $9,590,600 award accordingly, or find that the profitability of Defendant Ratier-Figeac's misconduct exceeds or is expected to exceed $5 million and confirm the original award.  The parties have briefed the issue and the Court is prepared to preliminarily rule.  However, because neither party presented the Court with sufficient evidence on the calculation of Defendant's profitability, the Court will order the parties to supplement the record.  After reviewing the parties' supplemental filings, the Court will set the matter for hearing only if necessary.

I.      **Background**

    A.      **District Court Proceedings**

Airbus Military ("Airbus") is developing a military transport aircraft called the A400M.

On July 24, 2003, Ratier-Figeac, S.A. ("Ratier") and Airbus entered into an agreement for Ratier

to manufacture and supply the propeller system for the A400M.  Eventually, ICE and Ratier

entered into a Memorandum of Understanding ("MOU") that provided ICE would design the

deicing controller for the propeller system.  Due to changes in the design specification after the

MOU was executed, but before the parties entered into a Master Terms Agreement or Purchase

Agreement, the parties participated in new price negotiations that ultimately were fruitless.

Ratier reopened the bidding process for the deicing controller and chose Artus to replace ICE as

the deicing controller supplier for the A400M project.

    This case was tried to a jury beginning on February 10, 2009 on various claims asserted

by Plaintiff under Kansas law, including misappropriation of trade secrets pursuant to the Kansas

Uniform Trade Secrets Act ("KUTSA").  On March 9, 2009, the jury returned its verdicts.

Against Ratier, the jury found liability for misappropriation of three specific trade secrets,

finding that Ratier provided Artus with three of ICE's trade secrets.  It awarded Plaintiff

$4,795,300 in compensatory damages, the full amount of lost profits damages sought.  These lost

profits were based on the projected sales of deicing controllers and spare parts to be sold by

Ratier to Airbus, less ICE's costs.  The jury also found that the misappropriation was willful

and/or malicious, and rendered an advisory punitive damages award in the amount of

$10,000,000.

    The Court considered the jury's punitive damages award as advisory and conducted a

separate hearing on the amount of punitive damages under the bifurcated procedure set forth in K.S.A. § 60-3702(a).[1]  In its pre-hearing brief, Defendant argued that punitive damages in this case must be capped at $5 million under K.S.A. § 60-3702(e) unless the Court made a finding that the profitability of Ratier's misconduct exceeded $5 million under § 60-3702(f).  Plaintiff argued that punitive damages should be governed by the KUTSA, which provides that "[i]f willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a)."[2]  Plaintiff argued in the alternative that even if the cap in § 60-3702 applied, the Court could make a finding under § 60-3702(f) that Ratier's profitability exceeded $5 million.

The Court ruled that the KUTSA cap applied and issued findings of fact and conclusions of law on the amount of punitive damages that should be awarded against both defendants.  The Court found that $9,590,600 in punitive damages against Ratier should be imposed after evaluating the statutory factors under K.S.A. § 60-3702(b).  Again, in its post-trial motions, Ratier argued that the Court applied the wrong statutory damages cap.  Plaintiff argued that it would be entitled to a larger punitive damages award than that awarded by the Court under § 60-3702 based on the "tens of millions of euros for sales of the propeller assembly for the first 180 aircraft, of which the deicing controller is a necessary and critical part."[3]  Plaintiff argued that Defendants "are expected to realize profits on OEM sales of between $85,000,000 and

---

[1]On October 24, 2011, the Tenth Circuit ruled Fed. R. Civ. P. 38, and not K.S.A. § 60-3702(a), controls the procedure in federal court for determining the size of a punitive damages award under Kansas law.  *Jones v. United Parcel Serv., Inc.*, –F.3d–, 2011 WL 5027642, at *12–13 (10th Cir. Oct. 24, 2011).

[2]K.S.A. § 60-3322(b).

[3]Doc. 816 at 81.

$139,500,000."[4]  The Court again found that the KUTSA cap applied and did not reach Plaintiff's alternative argument that the profitability of Ratier's misconduct exceeded $5 million.

### B.    Appeal

On appeal, Defendant argued that this Court erred by applying the KUTSA damages cap in K.S.A. § 60-3322 instead of the cap in the general punitive damages statute.  The Tenth Circuit agreed with Defendant.[5]  The court held that § 60-3702 governs the punitive damages inquiry in this case, including the cap, and acknowledged that this Court did not make a finding on Plaintiff's alternative argument that § 60-3702 (f) justifies a punitive damages award over $5 million because Ratier is expected to realize profits of between $85 and $139.5 million on the entire propeller project.  The court explained that to award punitive damages over the $5 million cap in §  60-3702(e), this Court must make a finding that "the profitability of the defendant's misconduct exceeds or is expected to exceed" the $5 million cap.[6]  The Tenth Circuit remanded this case, directing this Court

> to apply § 60–3702 and to consider whether the $5 million cap under § 60–3072(e) or the larger cap under § 60–3702(f) applies. We note that to apply subsection (f), the court must find that the profitability of *Ratier's misconduct*—not profitability from the entire project—exceeds or is expected to exceed $5 million.[7]

So before the Court on remand is a narrow question: does the profitability of Ratier's misappropriation of ICE's trade secrets exceed $5 million?

---

[4]*Id.*

[5]432 F. App'x 732, 740 (10th Cir. 2011).

[6]K.S.A. § 60-3702(f).

[7]432 F. App'x at 740 (emphasis in original).

4

II.     **Discussion**

The Court conducted a telephonic status conference on October 24, 2011, to establish a briefing schedule on the remand issue and left open whether a further hearing would be necessary.  Having now reviewed the parties' briefs, the Court finds that it is able to rule on the legal issues presented by the parties in their briefs and that oral argument would not materially assist that endeavor.  The Court is also able to determine the appropriate measure of Defendant's profitability from its misconduct, as set forth in detail below.  But because neither party has presented evidence to the Court that would allow it to properly calculate the amount of Defendant's profitability from the misconduct, the Court will direct the parties to further supplement the record.

Ratier has also moved for leave to file a surreply on the basis that Plaintiff raised new evidence and new arguments in the reply.  "[I]f the court relies on new materials or new arguments in a reply brief, it may not forbid the nonmovant from responding to those new materials."[8]   Because the Court need not rely on any of Plaintiff's new evidence or arguments submitted with the reply in order to render its decision, the motion for leave to file surreply is denied as moot.

A.     **Burden of Proof**

Under K.S.A. § 60-3702(f), the Court must find that the profitability of Ratier's misconduct exceeds or is expected to exceed $5 million in order for a punitive damages award to exceed the $5 million cap.  Plaintiff contends that a burden-shifting framework applies in determining profitability under K.S.A. § 60-3702(f), citing cases applying such a framework in

---

[8]*Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006).

determining a defendant's profitability as unjust enrichment damages, which are compensatory.

Under this approach, the plaintiff bears the initial burden of showing the defendant's sales and

the defendant has the burden of showing any portion of those sales that should not be attributable

to the misappropriation of trade secrets, and to show expenses.[9]   The rationale for this rule is that

the defendant is in exclusive possession of the data that allows for apportionment of net profits,

which often frustrates a plaintiff's ability to prove the amount of sales that are not attributable to

the misconduct.[10]   This principle is also explained in the commentary to the Restatement (Third)

of Unfair Competition § 45, in describing restitutionary relief in a trade secrets case by

measuring the defendant's gain.[11]

   Plaintiff cites no authority for the proposition that this burden-shifting approach should

apply in determining profitability under the Kansas punitive damages statute.   K.S.A. § 60-

3702(c) squarely places a clear and convincing burden of proof on the Plaintiff to show

entitlement to punitive damages, but the statute is silent with respect to the burden of proof on

amount.   The burden of presenting evidence about mitigating factors under § 60-3702(b), such as

the defendant's financial condition, rests with the mitigating party.[12]   But the issue before this

---

[9]*E.g.*, *Cartel Asset Mgmt v. Ocwen Fin. Corp.*, 249 F. App'x 63, 78–79 (10th Cir. 2007) (applying burden of showing apportionment on defendant in establishing actual damages in misappropriation of trade secrets case on unjust enrichment theory); *Petters v. Williamson & Assocs., Inc.*, 210 P.3d 1048, 1054 (Wash. Ct. App. 2009) (applying to calculation of unjust enrichment damages in trade secrets case); *Agilent Techs., Inc. v. Kirkland*, No. 3512-VCS, 2010 WL 610725, at *30 (Del. Ch. Feb. 18, 2010) (same).

[10]*See, e.g.*, *Cartel Asset Mgmt.*, 249 F. App'x at 78–79.

[11]Restatement (Third) of Unfair Competition § 45, cmt. f.  This comment also observes that "[i]f the trade secret accounts for only a portion of the profits earned on the defendant's sales, such as when the trade secret relates to a single component of a product marketable without the secret, an award to the plaintiff of defendant's entire profit may be unjust."  *Id.*

[12]*Paradigm Alliance, Inc. v. Celeritas Techs., LLC*, 722 F. Supp. 2d 1250, 1274 (D. Kan. 2010); *Laughinghouse v. Risser*, 786 F. Supp. 920, 926–27 (D. Kan. 1992); *Folks v. Kan. Power & Light Co.*, 755 P.2d 1319, 1334 (Kan. 1988) (stating that the plaintiff is not required to submit evidence about the financial condition of

Court on remand does not require reconsideration of the size of the punitive damages award.

None of the Kansas cases that consider the "profitability of the defendant's misconduct" under § 60-3702(f) apply the burden-shifting framework utilized in the cases on compensatory damages cited by Plaintiff.[13]  The Kansas Supreme Court has previously considered whether the trial court, in determining profitability under the punitive damages statute, improperly shifted the burden of proof by providing the defendant an opportunity to prove that a sum below the compensatory damages amount should be the measure of profit.[14]  The court found that the trial court did not improperly place the burden of proof on the defendant by merely affording him an opportunity to introduce evidence on the issue.[15]  Here, the Court applies the plain language of the statute, which requires it to make a factual finding that the profitability of Defendant's misconduct exceeds $5 million in order to confirm the punitive damages award previously imposed by the Court.  Evidence on Ratier's costs in the context of applying the proper damages cap does not constitute evidence of a mitigating factor such that a defendant should bear the burden of proof.  And it is Plaintiff that moves for application of the larger punitive damages cap.  The Court will not shift the burden of proving apportionment and costs to Defendant in

the defendant).

[13]*See Burton v. R.J. Reynolds Tobacco Co.*, 205 F. Supp. 2d 1253, 1259–60 (D. Kan. 2002) (evaluating the evidence presented at trial in determining that the profitability of defendant's misconduct exceeded $5 million), *rev'd on other grounds*, 397 F.3d 906 (10th Cir. 2005); *Commerce Bank, N.A. v. Chrysler Realty Corp.*, 183 F. Supp. 2d 1318, 1321 (D. Kan. 2002) (weighing as a factor under § 60-3702(b)); *Ramirez v. IBP, Inc.*, 950 F. Supp. 1074, 1079 (D. Kan. 1996) ("The record does not furnish any reliable basis for calculating the amount of profit attributable to these supervisors adopting discriminatory or retaliatory attitudes.  Still, the court does not believe that IBP can reasonably disclaim that it profited from the incentive system and the instances of pretextual discharges of injured employees."); *Gillespie v. Seymour*, 877 P.2d 409, 416 (Kan. 1994) (finding the trial court did not improperly shift the burden of proof to defendant on the issue of profit).

[14]*Gillespie*, 877 P.2d at 416.

[15]*Id.*

conducting its analysis under § 60-3702(f).

**B.      Profitability Applied to the Facts of this Case**

Profitability of the defendant's misconduct is also listed as a factor in § 60-3702(b) to be considered in fixing the amount of punitive damages, and Plaintiff presented evidence at trial and at the punitive damages hearing on this factor.  Defendant argued that there was no evidence of profitability due to the misconduct and that the Court should not evaluate the profitability of the propeller system, but instead the deicing controller.  Plaintiff argued that even if the cap in the general punitive damages statute applied, Defendants "are expected to realize profits on OEM sales of between $85,000,000 and $139,500,000," referring to Ratier's expected profitability for the entire A400M propeller system.  Plaintiff also insisted that application of the general punitive damages statute would allow for a punitive damages award in excess of $5 million, citing the profitability from the sales of the propeller assembly as a whole.[16]  Now, on remand, Plaintiff again asks this Court to look at profits "from [Ratier's] sale of the propeller assembly to Airbus," arguing that these profits could not have been earned without the deicing controller, obtained through misconduct.[17]  The Tenth Circuit has expressly foreclosed Plaintiff's position, instructing this Court that it must find "that the profitability of *Ratier's misconduct*—not the profitability from the entire project—exceeds or is expected to exceed $5 million."[18]

---

[16]Doc. 816 at 81.

[17]Doc. 918 at 13.

[18]432 F. App'x 732, 740 (10th Cir. 2011) (emphasis in original).  The Tenth Circuit rejected the argument Plaintiff made before this Court in the first instance that Ratier stood to profit between $85 and $139.5 million on the *entire project*, meaning the propeller assembly.  Doc. 777 at 9; Doc. 801 at 13; *see* 432 F. App'x at 740. Plaintiff's attempt to attribute the Court's reference in its post-trial order to the entire A400M project is unavailing and taken out of context. Doc. 801 at 12–13.  The Tenth Circuit's order expressly prohibits the Court from determining

Therefore, the sole question before the Court on remand is the appropriate measure of Defendant's profitability tied to Ratier's misconduct, the misappropriation of trade secrets. Because § 60-3702 applies to any punitive damages award, the Kansas Supreme Court has construed the term "profit" broadly.

> Product liability actions frequently include claims for punitive damages. In such actions there is no correlation between the compensatory damage award and the defendant's "profit" on the transaction. A product which sold for $25 may cause millions of dollars of personal injury or property damage. In such cases "profit" involves looking at the defendant's profit from the course of conduct giving rise to the plaintiff's injuries. In the case before us, we have an affirmed award of compensatory damages in the amount of $2,476,422. Neither personal injury nor property damage is involved. This involves money only, and the compensatory damage figure represents the Trust's injury as a result of what the trial court refers to as Seymour's "finagling" of its investments. Under the circumstances herein, we find no error in the trial court's determination that the amount of compensatory damages was Seymour's profit under K.S.A.1993 Supp. 60-3701. To hold otherwise could lead to incongruous results. As the plaintiffs point out, under Seymour's theory, had Seymour gambled away all the Trust moneys in Las Vegas, he could argue he had no profit at all—despite the Trust's huge loss of funds.[19]

Plaintiff relies on this passage for the proposition that the Court should look at the profit from the entire course of conduct giving rise to Plaintiff's injuries, the profits from the sale of the

---

profitability of the entire propeller assembly project and the Court follows this mandate. *See, e.g.*, *Huffman v. Saul Holdings L.P.*, 262 F.3d 1128, 1132–33 (10th Cir. 2001).

[19]*Gillespie*, 877 P.2d at 416. The Court previously found, in considering the § 60-3702(b) factors, that there was evidence of profitability in excess of $20 million for the propeller assembly. In considering the proper amount of punitive damages, the Court explained that this evidence, while in terms of the entire propeller assembly, showed the "strong incentive defendants had to deliver the propeller system to Airbus, which required a deicing controller that met Airbus specifications." Doc. 801 at 13. This finding, made in conjunction with all of the other factors set forth in § 60-3702(b), does not bind the Court in the context of § 60-3702(f), and certainly does not direct this Court to disregard the Tenth Circuit's clear directive to determine profitability from the misappropriation of trade secrets and not from the entire project. 432 F. App'x at 740.

entire propeller assembly.  Defendant contends that the Court should determine profit by looking at gain over expenditure on the deicing controller alone.  While Plaintiff is correct that the Court should look at Ratier's course of conduct, this does not justify measuring profitability by the profits of the entire propeller assembly, of which the deicing controller is but one part.  There was no evidence at trial that the misappropriation of ICE's trade secrets increased Defendant's profitability on other aspects of the propeller assembly.

Defendant suggests that the profitability determination is limited to the compensatory damages awarded by the jury in this case.  But the Court does not find that this is a proper measure of profitability, either.  The lost profits award in this case represents the profits Plaintiff would have gained, had it proceeded as the deicing controller supplier instead of Artus.  Here, the Court must determine the profits that Ratier gained or stands to gain by using ICE's trade secrets, a different proposition.

Plaintiff complains that despite repeated attempts to determine net profits of the deicing controller through discovery, Defendant failed to produce this information.  So Plaintiff attempts to measure Defendant's profitability by extrapolating the profits of the deicing controller as a percentage of the net profits of the propeller assembly, another figure that was produced during discovery.  Relying on this calculation attributes all of Ratier's profits associated with the deicing controller to the misappropriation of trade secrets.  But this cannot be the appropriate measure of damages either.  While Plaintiff presented evidence at trial that the deicing controller would have been inferior and the design process more time-consuming without ICE's trade secrets, there was no evidence that Ratier could not have proceeded at all with the propeller assembly without ICE's trade secrets.

10

The misconduct in this case is the misappropriation of three discrete trade secrets that were incorporated into the deicing controller design, as the jury explicitly found.  ICE's theory of the case was that after renewed price negotiations broke down on design changes to the deicing controllers, Ratier misappropriated ICE's three trade secrets and passed them along to ICE's replacement, Artus, allowing Ratier to quickly move forward with the design and pay a lower contract price.  Ratier's profitability, therefore, would be measured by the difference in Ratier's profits had it paid ICE for its trade secrets by using ICE as the deicing controller supplier, and the profit it instead made by using Artus and saving money by passing along ICE's trade secrets. In the Court's view, this difference in profit can essentially be measured by the difference in Ratier's costs between the ICE and Artus designs, as there is no evidence that Ratier would have charged Airbus a higher price for ICE's deicing controller.[20]

The Court cannot make a finding on this measure of profitability based on the evidence presented by the parties with their briefs.  It appears that Ratier provided to Plaintiff information and documents on the price to be charged by Ratier for each A400M deicing controller, as well as the total amount of development costs and expenses through November 16, 2008.[21]  Ratier further represented in its interrogatory responses:

> Defendants do not have in their possession, custody or control documents that concern, relate to or evidence the gross profit

---

[20]The Court rejects Defendant's suggestion that the difference should be measured by the costs Ratier saved by using Artus as opposed to Curtiss-Wright, Aerazur, or DCHS, other companies in the running to replace ICE in 2005 after the price negotiations broke down.  The evidence at trial was that the misappropriation took place after the 2005 Passport Review and selection of Artus, so any assumption that misappropriation would not have occurred with these other competitors is pure supposition.  Instead, the measure should be the cost savings by using Artus with ICE's trade secrets as opposed to using ICE as the deicing controller manufacturer.

[21]Ninth Amended Answers to Plaintiff's Interrogatories, Doc. 918, Ex. H, at ¶ 12(c) (setting forth the price to be charged by Ratier for the deicing controller).

> obtained from the sale or installation of the deicing system on the
> A400M project, but defendants previously produced and identified
> in response to this interrogatory documents that concern, relate to
> or evidence the price that Ratier is paying to Artus for the deicing
> controller and the costs to design, develop, manufacture, test,
> assemble, produce and deliver the deicing controller, from which
> gross profit could be determined.[22]

Plaintiff appears to take issue with the fact that Ratier did not produce its final gross profits

figures and instead only provided the raw data.  But Plaintiff does not argue that these

documents do not exist or that they were not produced; indeed, the Court is aware that some of

these documents were relied upon in proving the lost profits damages award.

The Court will not reopen discovery.  Given the trial evidence and the answers to

Plaintiff's interrogatories, attached to ICE's brief, it is clear to the Court that ICE has had ample

opportunity to discover the relevant information to make a profitability determination and that it

was on notice of its burden to do so.  Nonetheless, it is apparent to the Court that ICE has

previously focused on Ratier's profits for the propeller assembly as a whole and that ICE has not

previously sought a calculation of Ratier's cost savings by using Artus instead of ICE to design

and manufacture the deicing controller.  A damages expert must consider the raw data from

discovery and calculate Ratier's profitability in terms of cost savings.  This should generally

involve a calculation of the difference in profits Ratier stands to gain by using Artus as the

deicing supplier along with ICE's trade secrets, and the profits Ratier stood to gain had it used

ICE as the supplier.  The Court will allow Plaintiff an opportunity to present this evidence in the

form of a supplemental affidavit by its damages expert, attaching any necessary supporting

---

[22]*Id.*

evidence.  Defendant will be allowed an opportunity to file objections to the supplemental

affidavit or submit rebuttal evidence of profitability and Plaintiff will be allowed to respond.

After reviewing the supplemental submissions by the parties, the Court will set the matter for

hearing only if it determines that further development of the record is necessary.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion for Hearing

(Doc. 927) is **denied**.  Oral argument will not materially assist the Court as to the legal issues

addressed by this Memorandum and Order.  As to the factual finding on Ratier's profitability

under the formula set forth above, the Court orders the parties to supplement the record as

follows: Plaintiff shall have until March 13, 2012 to submit a supplemental damages calculation

by its expert based on the guidance set forth in this Memorandum and Order.  No brief shall by

filed in conjunction with this supplement.  Defendant shall have until March 27, 2012 to file any

objections to Plaintiff's evidence on the profitability calculation.  Plaintiff shall have until April

3, 2012 to respond to Defendant's objections.  The objections and response to objections shall

not exceed ten (10) pages and no further briefing shall be filed without prior leave of court.

**IT IS FURTHER ORDERED** that Defendant's Motion for Leave to file a Surreply

Brief (Doc. 925) is **denied as moot**.

Dated: February 13, 2012

 S/ Julie A. Robinson                              
 JULIE A. ROBINSON
 UNITED STATES DISTRICT JUDGE